## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

In re: )
 )
**STEEL CITY POP** )
**HOLDING, LLC,** *et al.*[1] ) **Case No: 19-04687-DSC11**
 )
**Debtors.** )

## DEBTOR'S SECOND MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO (I) USE CASH COLLATERAL, (II) OBTAIN POST-PETITION FINANCING AND (III) SCHEDULING FINAL HEARING

COMES NOW, Steel City Pop Holding, LLC ("SCP Holding") as debtor and debtor in possession and, pursuant to pursuant to §§ 105, 361, 362, 363(c), 364(c)(l)-(3), 364(d) and 363(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), moves this Court (this "Second DIP Motion") to enter an interim order (the "Second Interim DIP Order") and a final order (the "Second Final DIP Order") approving and authorizing SCP Holding and its Related Debtors (as defined herein) to obtain post-petition financing, use cash collateral, and schedule final hearings as necessary.

---

[1] The Debtors in these chapter 11 cases include: Steel City Holding, LLC., Case No. 19-04687-DSC11; Steel City Pops B'ham, LLC, Case No. 19-04689-DSC11; Steel City Pops DTX, LLC Case No. 19-04692-DSC11; Steel City Pops FWTX, LLC, Case No. 19-04695-DSC11; and Steel City Pops, LKY, LLC, Case No. 04697-DSC11.

## Concise Statement of the Relief Requested[2]

The Debtor (as defined herein) proposes to obtain post-petition financing (the "Second DIP Loan"; and collectively with the First DIP Loan, as defined herein, the "DIP Facility") from the three (3) Pre-Petition Date secured lenders, Redmont Private Debt Fund III, L.P. ("Redmont"), NobleBank&Trust ("NobleBank") and ServisFirst Bank ("ServisFirst"; and collectively with Redmont and NobleBank, the "Lenders") on the following terms:

    a.      The Second DIP Loan shall be made to SCP Holding and the Related Debtors as co-obligors.

    b.      Upon entry of the Second Interim DIP Order, the Second Interim DIP Loan shall be funded in the total amount of $300,000.00 provided solely by all three Lenders with: i) ServisFirst funding $112,500.00; ii) Redmont funding $112,500.00; and iii) NobleBank funding $75,000.00.

    c.      Upon entry of the Second Final DIP Order, the balance of the Second DIP Loan shall be funded in the amount of $500,000.00, for a total Second DIP Loan of $800,000.00, which shall be solely provided by all three Lenders with: i) ServisFirst funding $187,500.00; ii) Redmont funding $187,500.00; and iii) NobleBank funding $125,000.00.

    d.      The DIP Facility shall accrue interest at the fixed rate of 5% per annum with interest-only payments due on the first (1st) day of each month beginning January 1, 2020.

    e.      The DIP Facility shall mature at the earlier of (the "Maturity Date"): i) January 31, 2020; (ii) the effective date of a plan of reorganization confirmed by the Court in the Bankruptcy Cases , (iii) the consummation of a sale(s) of all or substantially all of the assets of SCP Holdings or the Related Debtors; (iv) conversion of any of the Bankruptcy Cases to chapter 7; (vi) entry of an order in any of the Bankruptcy Cases appointing any examiner having expanded powers or a trustee to operate all or any part of the business(es); or (v) the entry of an order by the Court approving an alternate DIP Loan; and (vi) such later date as the Lenders in their sole discretion may agree to in writing with the Debtor.

    f.      The DIP Facility shall be earmarked for use to satisfy the  Budget, as provided in connection with this Second DIP Motion and shall not be

---

[2] Any capitalized terms not defined in this Concise Statement of the Relief Requested shall have the meanings set forth in the body of this Second DIP Motion.

used for purposes not set forth in the Budget without prior written consent from all Lenders subject to any variances allowed by Lenders.

g.     A default under the DIP Facility shall occur if any one or more of the following events shall occur (each, an "Event of Default"):

i.    The Debtor's failure to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in any credit agreement or similar document evidencing or describing the DIP Facility, this Second DIP Motion, the First or Second Interim DIP Order or First or Second Final Order.

ii.   The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability of the DIP Facility being contested by any Debtor denying in writing that it has any further liability or obligation under the DIP Facility or the Lenders ceasing to have the benefit of the liens granted by the Court related to the DIP Facility.

iii.  The entry of any order of the Court granting to any third party a claim or lien *pari passu* with or senior to that granted to the Lenders described herein.

iv.   Until the DIP Obligations are repaid in full, the Debtor shall not make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Facility or other than in accordance with the Budget approved by the Lenders.

v.    If, as of any reporting date, the Debtor's cumulative sales, cash disbursements and/or receipts from the period from the Petition Date through the last date covered by the report exceeds the Permitted Variances for that period.

vi.   The Debtor fails to make any interest payments due under the DIP Facility, as approved by the Court, within three (3) business days of when due.

vii.  The entry of an order converting any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, or any Debtor filing a motion or not opposing a motion seeking such relief.

viii. The entry of an order dismissing any of the Bankruptcy Cases, or any Debtor filing a motion or not opposing a motion seeking such relief, unless consented to by the Lenders.

ix.   The entry of an order in any of the Bankruptcy Cases or any successor case, which order constitutes the stay, modification, appeal or reversal of any interim or final order approving the DIP Facility or which otherwise affects the effectiveness of the DIP Facility.

x.  The entry of an order in any of the Bankruptcy Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against the collateral pledged pursuant to the DIP Facility, of any Debtor or to commence or continue any prepetition litigation against any Debtor involving potential liability not covered by insurance, in excess of $10,000 in the aggregate.

xi.  Any non-monetary, judgment or order with respect to a postpetition event shall be rendered against any Debtor that does or would reasonably be expected to (i) cause a material adverse change in the financial condition, businesses, prospects, operations or assets of such Debtor or (ii) have a material adverse effect on the rights and remedies of the Lenders hereunder, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

xii.  The Second Interim DIP Order or Second Final DIP Order being amended or modified without the consent of Lenders.

h.  The Debtor will further adequately protect the Lenders by granting the Lenders a security interest in all of the Debtor's cash collateral (the "Cash Collateral"), which the Debtor shall be able to use in accordance with the Budget.

i.  As of the Petition Date, the Lenders each had and continue to have a valid, enforceable, priority security interest in the collateral (the "Pre-Petition Collateral" and together with the Cash Collateral, collectively, the "Collateral") that secures each Lender's pre-petition claim.  Furthermore, the Lenders were provided various accommodation and consideration pursuant to the First Interim DIP Order.

j.  The pre-Petition Date liens are legal, valid, binding, enforceable and not subject to attack, subordination, recoupment, defense, counterclaim, offset or avoidance.

k.  Each Debtor releases and is forever barred from bringing or asserting claims, counterclaims, claims or causes of actions against the Lenders relating to the pre-Petition Date loans.

l.  Upon the occurrence of an Event of Default, the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the Lenders to exercise all rights and remedies provided at law and equity, in the Second Interim DIP Order, and the Second Final DIP Order, as applicable, and to take any or all of the following actions without further order of or application to this Court.

m.  The Court will enter an interim order, in form and substance acceptable to the Lenders and its counsel, on or before December 11, 2019

after submission of this Second DIP Motion as agreed to by the DIP Lender and Debtor (the "Second Interim DIP Order") which order, *inter alia*, shall approve the Second DIP Loan on an interim basis, including, without limitation, the grant of: i) pursuant to sections 364(c)(1) a super-priority administrative expense claim against the Debtor's estate; and ii) pursuant to sections 364(c)(2), and 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and liens on all property owned by the Debtor.

n.      Any rights, liens and interests granted to the Lenders hereunder shall be provided, *pari passu*, to the Lenders on a first-priority basis for funding the First DIP Loan and on a second-priority basis, *pari passu*, to all Lenders for funding the Second DIP Loan, with an express carve-out for any expenses due to the U.S. Bankruptcy Administrator for the Northern District of Alabama.

**Procedural History**

2.      On November 14, 2019, (the "Petition Date") SCP Holding filed its voluntary petition for relief (the "Petition") [Doc. No. 1] under chapter 11 of the Bankruptcy Code with the Clerk of this Court identified as case number 19-04687-DSC11 (the "Bankruptcy").

3.      In addition to SCP Holding's Petition, related entities Steel City Pops B'ham, LLC ("SCP B'ham"); Steel City Pops DTX, LLC ("SCP DTX"); Steel City Pops FWTX, LLC ("SCP FWTX") and Steel City Pops LKY, LLC ("SCP LKY"; and collectively with SCP Bham, SCP DTX, and SCP FWTX, the "Related Debtors"; and collectively with SCP Holding, the "Debtor")[3] filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code identified as case numbers 19-04689-DSC11, 19-04692-DSC11, 19-04695-DSC11 and 19-04697-DSC11, respectively (collectively

---

[3] To the extent the term "Debtor" is used in this Motion, it shall be construed to apply not only to Steel City Pop Holding, LLC, but the term shall also be inclusive of the Related Debtors, who shall be co-obligors under any Second DIP Loan described herein and co-grantors of any collateral or consideration required under the Second DIP Loan.

with the Bankruptcy, the "Bankruptcy Cases").  The bankruptcy for SCP Holdings and the Related Debtors were approved for joint administration by this Court's Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Doc. No. 28].

4.　　The Debtor continues to operate their businesses and manage their properties as debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.　　This Court previously entered *its Interim Order Granting in Part, and Denying in Part, the Debtors' Motion for Interim and Final Orders Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Post-Petition Financing and (III) Scheduling Final Hearing* (the "First Interim DIP Order") [Doc. No. 30].  The First Interim DIP Order  approved the first post-Petition-Date financing by the Lenders in favor of the Debtor in the aggregate amount of $90,000.00 to fund the payroll payment due on November 29, 2019 (the "First DIP Loan"), but denied the request for approval of a $60,000.00 post-Petition Date loan by Redmont to the Debtor on a *nunc pro tunc* basis to fund the payroll payment due on November 15, 2019 (the "Emergency DIP Loan").

6.　　A final hearing on approval of the First DIP Loan is scheduled for December 11, 2019 before this Court (the "First Final DIP Hearing").

7.　　This Court has jurisdiction over this matter pursuant to 28 U.S.C.  §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of Debtor's chapter 11 case and this Second DIP Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is Bankruptcy Code §§ 105, 361, 362, 363(c), 364(c)(l)-(3), 364(d) and 364(e), in addition to Bankruptcy Rules 2002, 4001 and 9014.

8.      No request for the appointment of a trustee or examiner has been made in the Bankruptcy.

**Factual Background**

9.      SCP Holding and its Related Debtors are engaged in the production and sale of gourmet popsicles at several locations in Alabama, Texas, and Kentucky.  SCP Holding is the parent company of each of the other Related Debtors.

10.     Prior to the Petition Date, Redmont, NobleBank and ServisFirst each had one or more loans outstanding to SCP Holding, one or more of the Related Debtors and one or more of the entities related to SCP Holding that has not filed for protection under the Bankruptcy Code (the "Non-Debtor Related Entities") secured by various collateral granted by SCP Holding and one or more of the Related Debtors and Non-Debtor Related Entities.

*The Redmont Loan*

11.     More specifically, on December 7, 2018, Redmont made a loan in the principal amount of $1,250,000.00 (the "Prepetition Redmont Loan") to: (i) SCP Bham; (ii) SCP DTX; (iii) SCP FWTX; (iv) SCP LKY; (v) Steel City Pops, ATL, LLC, a Georgia limited liability company ("SCP ATL"); (vi) Steel City Pops, SATX, LLC, a Texas limited liability company ("SCP SATX"); (vii) Steel City Pops, HTX, LLC, a Texas limited liability company ("SCP HTX"); and (viii) Steel City Pops, ATX, LLC, a Texas limited liability company ("SCP ATX")[4] (collectively, the "Prepetition Redmont Borrowers").

---

[4] As of the date of this Motion, SCP ATL, SCP SATX, SCP HTX and SCP ATX have not filed bankruptcy.

12.     The Prepetition Redmont Loan is evidenced by, among other documents, that certain Secured Promissory Note dated December 7, 2018, executed by the Prepetition Borrowers in favor of Redmont in the principal amount of $1,250,000.00 (the "Prepetition Redmont Note").

13.     SCP Holding guaranteed the obligations of the Prepetition Redmont Borrowers under the Prepetition Redmont Loan, as evidenced by a certain Continuing Guaranty dated December 7, 2018, executed by SCP Holding in favor of Redmont.

14.     As security for the Prepetition Redmont Loan, the Prepetition Borrowers and SCP Holding executed in favor of Redmont a certain Security Agreement dated December 7, 2018, whereby the Prepetition Borrowers and SCP Holding pledged the following collateral to Redmont (collectively, the "Prepetition Redmont Collateral"):

> all personal and fixture property of every kind and nature including without limitation all goods (including inventory and equipment), instruments (including promissory notes), documents, accounts and account receivables (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contracts, contract rights or rights to the payment of money, insurance claims, books, records, all general intangibles (including all payment intangibles), and substitutions, accessions, additions, parts, accessories, attachments, replacements, proceeds and products of, for and to any and all of the foregoing.

15.     Redmont perfected its security interest and lien upon the Prepetition Redmont Collateral by filing UCC financing statements in the appropriate jurisdictions.

16.     In connection with the Prepetition Redmont Loan, a certain Intercreditor Agreement dated December 7, 2018 was executed by Redmont, ServisFirst and

NobleBank, to clarify and agree upon certain respective rights and interests of Redmont, ServisFirst and Noble (the "Intercreditor Agreement").

*The NobleBank Loan*

17.     On May 26, 2017, NobleBank made a loan in the principal amount of $1,500,000.00 (the "Prepetition NobleBank Loan") to: (i) SCP Holding; (ii) SCP Bham; (iii) SCP DTX; (iv) SCP FWTX; (v) SCP ATL; (vi) SCP SATX; (vii) SCP HTX; (viii) SCP ATX; and (ix) SCP LKY (collectively, the "Prepetition NobleBank Borrowers").

18.     The Prepetition NobleBank Loan is evidenced by, among other documents, a certain Loan and Security Agreement dated May 26, 2017, by and between NobleBank and the Prepetition NobleBank Borrowers (the "Prepetition NobleBank Loan Agreement").

19.     The Prepetition NobleBank Loan is further evidenced by, among other documents, a certain Promissory Note dated May 26, 2017, executed by the Prepetition NobleBank Borrowers in favor of NobleBank in the principal amount of $1,500,000.00 (the "Prepetition NobleBank Note").

20.     James A. Watkins ("Watkins"), guaranteed the obligations of the Prepetition NobleBank Borrowers under the Prepetition NobleBank Loan, as evidenced by a certain Guaranty dated May 26, 2017, executed by Watkins in favor of NobleBank (the "Watkins NobleBank Guaranty," and, together with the Prepetition NobleBank Loan Agreement and the Prepetition NobleBank Loan Note, collectively the "NobleBank Loan Documents").

21.     As security for the Prepetition NobleBank Loan, the Prepetition NobleBank Borrowers pledged the following collateral to NobleBank (collectively, the "Prepetition NobleBank Collateral") pursuant to the Prepetition NobleBank Loan Agreement:

> Contract rights and all of the accounts, notes, bills, acceptances, chattel paper, instruments, or other forms of obligations now existing or hereafter coming into existence in which [Prepetition NobleBank Borrowers] now have or may hereafter acquire any right; all proceeds thereof; all tax refunds due or to become due from the United States or the State of Alabama; money on deposit with any bank or savings and loan association;

> All inventory now or hereafter owned or acquired by [Prepetition NobleBank Borrowers] wherever the same shall be located, and whether or not such Inventory or any part there of shall be in existence at the date hereof or shall come into existence subsequently thereto (the term "Inventory" being deemed to include all goods, wares, equipment, parts, merchandise, supplies, and materials of every nature used or usable in connection with [Prepetition NobleBank Borrowers] business);

> All trademarks, service marks, goodwill, copyrights, trade secrets, licenses, patent rights, software, intangible rights, and general intangibles;

> All equipment, machinery, furniture, furnishings, trade fixtures, shelving, office equipment, and office supplies;

> All goods as shall from time to time be described by type, class, or item on any schedule supplementary hereto; and

> All proceeds of the goods and intangibles described above; and

> All of our books and records relating to those goods and intangibles described above.

22.     NobleBank perfected its security interest in and lien upon the Prepetition NobleBank Collateral by filing UCC financing statements in the appropriate jurisdictions.

23.     Pursuant to the Prepetition NobleBank Loan Agreement and the Intercreditor Agreement, NobleBank has advanced additional funds to the Prepetition NobleBank Borrowers in the approximate amounts of $167,547.00 and $171,405.12 prior

to the Petition Date, as more particularly described in that certain Acknowledgement of Additional Indebtedness Pursuant to Intercreditor Agreement dated February 28, 2019 between the Lenders (the "Intercreditor Acknowledgement").

*The ServisFirst Loans*

24.    On January 6, 2014, ServisFirst made a loan in the principal amount of $600,000.00 ("ServisFirst Loan I") to SCP Bham as evidenced by that certain SBA Note dated January 6, 2014 in the original principal amount of $600,000.00.

25.    On January 29, 2015, ServisFirst extended a revolving line of credit to SCP Bham in the maximum principal amount of $200,000.00 ("ServisFirst Loan II") to SCP Bham as most evidenced by that certain Promissory Note made by SCP Bham in favor of ServisFirst dated January 29, 2015 in the original principal amount of $600,000.00.

26.    On October 13, 2015, ServisFirst made a loan in the principal amount of $1,600,000.00 ("ServisFirst Loan III") to: i) SCP B'ham, ii) SCP LKY; iii) SCP Holding; iv) SCP DTX; v) SCP FWTX; and vi) SCP HTX (collectively, the "Prepetition ServisFirst Borrowers") as evidenced by that certain SBA Note in favor of the Lender dated October 13, 2015 in the original principal amount of $1,600,000.00.

27.    On October 3, 2016, ServisFirst made a loan in the principal amount of $1,500,000.00 ("ServisFirst Loan IV") to the Prepetition ServisFirst Borrowers as evidenced by that certain Promissory Note in favor of the Lender dated October 3, 2016 in the original principal amount of $1,500,000.00.

28.    Additionally, pursuant to the Intercreditor Agreement and as described in the Intercreditor Acknowledgement, ServisFirst has advanced additional funds to SCP

Holding, the Related Debtors and the Non-Debtor Related Entities in the approximate amounts of $366,980.00 and $375,447.00 (collectively with ServisFirst Loans I – IV, the "Prepetition ServisFirst Indebtedness").

29.    As security for the Prepetition ServisFirst Indebtedness, ServisFirst was granted a pre-petition security interest in various collateral owned by one or more of the Debtor pursuant to: that certain Loan and Security Agreement date January 6, 2014; that certain SBA Security Agreement dated January 6, 2014; that certain Loan and Security Agreement dated October 13, 2015; that certain SBA Security Agreement dated October 13, 2015; that certain Commercial Security Agreement dated January 29, 2015; that certain Loan and Security Agreement dated October 3, 2016; and that certain Loan Modification, Acknowledgement and Forbearance Agreement dated December 14, 2018; all of which were by and between ServisFirst and one or more of the Prepetition ServisFirst Borrowers, among others.  Accordingly, the Prepetition ServisFirst Borrowers pledged the following collateral to ServisFirst (the "Prepetition ServisFirst Collateral"):

(a)    all equipment, inventory, fixtures and other tangible property of any of the Joint Borrowers and any and all accessions and additions thereto, any substitutions and replacements therefor, and all attachments and improvements placed upon or used in connection therewith, or any part thereof;

(b)    all accounts, contracts and general intangibles of the Joint Borrowers;

(c)    all of Joint Borrowers' rights as an unpaid vendor or lienor, including stoppage in transit, replevin, detinue and reclamation;

(d)    all moneys and any of the Joint Borrowers, all deposit accounts of Joint Borrowers in which such moneys may at any time be on deposit or held, all investments or securities of any of the Joint Borrowers in which such moneys may at any time be invested and all certificates, instruments and documents of any of the Joint Borrowers from time to time representing or evidencing any such moneys;

(e)    all investment property of any of the Joint Borrowers;

(f)    any other property of any of the Joint Borrowers now or hereafter held by the Lender or by others for the Lender's account;

(g)     all rights, interest, dividends, proceeds, products, rents, royalties, issues and profits of any of the property described in the foregoing granting clauses, whether the product of sale, lease, license, exchange or other disposition of the Personal Property, paid or accruing before or after the filing of any petition by or against any of the Joint Borrowers under the federal Bankruptcy Code, and all instruments delivered to the Lender in substitution for or in addition to any such property; and
(h)     all supporting obligations; and
(i)     all books, documents, files, ledgers and records (whether on computer or otherwise) covering or otherwise related to any of the property described in the foregoing granting clauses.

30.     ServisFirst perfected its security interest in and lien upon the Prepetition ServisFirst Collateral by filing UCC financing statements in the appropriate jurisdictions.

31.     Additionally, repayment of the ServisFirst Indebtedness was absolutely and unconditionally guaranteed by: i) SCP ATL and SCP SATX pursuant to those certain Guaranty Agreements dated December 14, 2018; ii) SCP ATX pursuant to that certain Guaranty Agreement dated February 28, 2018; and iii) Watkins pursuant to those certain Guaranty Agreements dated January 6, 2014, January 29, 2015, October 13, 2015, October 3, 2016, December 14, 2018 and February 28, 2018.

**Proposed Second DIP Loan**

*Second Interim DIP Loan*

32.     The Lenders previously provided the First DIP Loan to the Debtor to fund the Debtor's obligations related to payroll due on November 29, 2019.[5]

---

[5] Likewise, the $60,000.00 Emergency DIP Loan made by Redmont funded virtually identical payroll obligations due on November 15, 2019. However, due to the *nunc pro tunc* relief requested regarding this Emergency DIP Loan, this Court denied its approval without prejudice.

33.     The First DIP Loan was intended to provide breathing room for the Debtor and Lenders to evaluate the Debtor's needs to survive the downturn of the seasonal nature of its business.

34.     Since the entry of the First Interim DIP Order, the Debtor and Lenders have continued negotiations and shard information resulting in the revised budget (as revised, the "Budget") that the Second DIP Loan is intended to fund while allowing the Debtor to market its assets and ongoing business for sale.

35.     Accordingly, the Lenders have agreed to fund a second DIP Loan (the "Second DIP Loan") in the aggregate amount of $800,000.00, comprised as follows:

  a. an initial loan in an amount of not more than $300,000.00 (the "Second Interim DIP Loan"), comprised of loans in the respective amounts of: i) $112,500.00 by ServisFirst; ii) $112,500.00 by Redmont; and iii) $75,000.00 by NobleBank, contingent upon entry of an order by this Court approving the Second DIP Loan on an interim basis (the "Second Interim DIP Order").

  b. an additional loan in an amount of not more than $500,000.00 (along with the Second Interim DIP Loan, the Second DIP Loan), comprised of loans in the respective amounts of: i) $187,500.00 by ServisFirst; ii) $187,500.00 by Redmont; and iii) $125,000.00 by NobleBank, contingent upon entry of an order by this Court approving the Second DIP Loan on a final basis (the "Second Final DIP Order").

If the Second DIP Loan is approved pursuant to the Second Final DIP Order, the Second DIP Loan will total $800,000.00, with $300,000.00 being approved on an interim basis with an additional $500,000.00 being approved on a final basis.

36.     Since filing the Petition, the Lenders have each requested and been provided an opportunity to inspect the books, records, financial and accounting information maintained by the Debtor (the "Financial Inspection"). The Lenders seek and Debtor

approves of the Lenders' continued ability to pursue the Financial Inspection through the pendency of the Bankruptcy Cases.

*Budget*

37.     All advances under the DIP Facility and the Cash Collateral shall be used by the Debtor solely to fund the Debtor's operation and to conduct and pursue a reorganization process as set forth herein, in accordance with the Budget as approved by the Lenders, as such Budget may be modified with the Lenders' written consent and without further order of the Court.  Compliance with the Budget will be measured every week of the Bankruptcy Cases.

38.     For the avoidance of doubt, (i) the Debtor may amend the Budget with the written consent of the Lenders, *provided* that the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by the Court; and (ii) at any given time, the Debtor's actual receipts and cash disbursements may, on a cumulative basis, vary from the Budget by no more than 10% (the "Permitted Variance").  The Debtor shall provide the Lenders with weekly cumulative variance reporting on a line item basis (including for sales, cash receipts, and cash disbursements), which reporting shall (a) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and (b) provide an explanation of any per line variance greater than 10% (the "Variance Report").

39.     The Budget shall be provided on a weekly basis and broken out by weeks including a 13-week cash flow projection.

*Sale & Bidding Procedures*

40.     The Debtor shall file a motion in form acceptable to the Lenders for approval of bid procedures (the "Bid Procedures") and sale of virtually all of the Debtor's cumulative business assets (the "Sale Assets") in accordance with § 363 of the Bankruptcy Code with one more of the Lenders serving as a stalking horse bidder for the Sale Assets (the "Sale Motion").  The Sale Motion shall be filed on or before December 26, 2019. The Bid Procedures shall be approved by an order of the Court in form acceptable to the Lenders on or before January 15, 2019.  An order approving the sale of the Sale Assets shall be entered the Court in form acceptable to the Lenders on or before January 31, 2020.

*Debtor's Need for the Second DIP Loan*.

41.     The Debtor has determined the Second DIP Loan is necessary for the Debtor to operate its businesses in chapter 11 and for the Debtor's successful reorganization. Because the Debtor's existing cash on hand and projected operating revenues will not be sufficient to fund the completion of its restructuring process, the Debtor concluded that obtaining a firm commitment for post-petition financing at the outset of the Bankruptcy Cases is necessary and in the best interest of their estates.

42.     The Debtor has an immediate need to obtain the Second DIP Loan and use cash collateral to, among other things, pay operating expenses as well as restructuring related expenses.  The access of the Debtor to sufficient working capital and liquidity through the use of cash collateral and the incurrence of new indebtedness from borrowed money is vital to the preservation and maintenance of the going concern values of the Debtor and to a successful reorganization of the Debtor.

43.     Moreover, the ability to fund the expenses set forth in the Budget is essential to the Debtor's operation after the Petition Date.  Otherwise, the Debtor's operations would grind to a standstill.

44.     The Debtor is unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under §§ 364(a) and (b) of the Bankruptcy Code, or credit secured by liens on Debtor's assets junior to existing pre-Petition Date liens, as contemplated by § 364(c) of the Bankruptcy Code.

45.     The Debtor therefore determined, in the exercise of its sound business judgment, that the general terms of the proposal for the Second DIP Loan provided by the Lenders is the most favorable under the circumstances and addresses the Debtor's working capital needs.  The Debtor does not believe they could obtain proposals for post-petition financing on general terms and conditions more favorable to the Debtor's estates than those offered by the Lenders as set forth herein.

46.     Before determining to enter into the Second DIP Loan, the Debtor and the Lenders conducted and continue to conduct lengthy, arm's-length, and good faith negotiations.

47.     Moreover, the Second DIP Loan is subject to the Debtor complying with the terms of the budget annexed to any interim or final order approving the Second DIP Loan and seeking the Lenders' approval for any expenditures that are more than a 10% variance from said budgeted amounts.

48.     By this Second DIP Motion, the Debtor seeks authority for the continued use of cash collateral, as defined in § 363(a) of the Bankruptcy Code by providing a replacement lien in post-Petition Date cash collateral to the Lenders pursuant to § 361(2) of the Bankruptcy Code and if the replacement lien pursuant to § 361(2) is insufficient, a lien pursuant to § 364(d) of the Bankruptcy Code.

49.     Further, the Debtor seeks to enter into post-Petition Date financing with the Lenders as described herein and in turn provide the Lenders with protections afforded by § 364(c)(1)-(3) of the Bankruptcy Code, including but not limited to a super-priority administrative expense claim for the amount of the Second DIP Loan.

**Basis for Relief**

A.  Use of Cash Collateral

50.     The Debtor seeks to use its cash collateral pursuant to § 363(c)(2).  Section 363(c)(2) allows a debtor to use cash collateral with Court permission and conditioned upon adequate protection.  The Debtor proposes to adequately protect the Lenders by granting the Lenders a security interest in post-petition cash collateral as provided in § 361(2) of the Bankruptcy Code.

51.     Moreover, to the extent the replacement lien provided by § 361(2) is insufficient to replace the cash collateral consumed by the Debtor, the Lenders shall be provided a lien pursuant to § 364(c)(1) – (3) for the decrease in value of the cash collateral subject to an interest of the Lenders.

B.  Approval of Financing

52.     As described above, it is essential to the success of the Debtor's chapter 11 cases that the Debtor immediately obtain access to sufficient post-petition financing. The preservation of estate assets, the Debtor's continuing viability and its ability to reorganize successfully, thus, depend heavily upon the expeditious approval of the Second DIP Loan and the related actions requested herein.

53.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(l) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize a debtor to obtain credit or incur debt:

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

54.     In the event a debtor is unable to obtain credit under the provisions of § 364(c) of the Bankruptcy Code, a debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien." 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted or such lien holder consents. Each Lender has consented to a priming lien pursuant to § 364(d) as to each Lender's pre-Petition Date collateral subject to the relative priority of each Lender as to such collateral.

55.     The Debtor has pursued various potential avenues of post-petition financing, but has been unable to procure the required funds in the form of unsecured credit

or unsecured debt with an administrative priority. In addition, the Debtor has been unable to procure the required funds solely under § 364(c) of the Bankruptcy Code. The Debtor negotiated the Second DIP Loan at arm's-length and pursuant to the Debtor's business judgment. The terms and provisions of the Second DIP Loan are fair and reasonable under the circumstances and reflect the most favorable terms upon which Debtor could obtain post-petition financing.

56. The general terms and conditions of the Second DIP Loan are fair and reasonable and were negotiated by the parties in good faith and at an arm's length. Accordingly, the Lenders should be accorded the benefits of § 364(e) of the Bankruptcy Code in respect of the Second DIP Loan.

57. The Second DIP Loan will enable the Debtor to, among other things (a) maintain the continuity of its operations, (b) maximize the value of its business and properties for the benefit of the Debtor's estates and creditors, and (c) give the Debtor's vendors, suppliers, and customers the necessary confidence to continue ongoing relationships with the Debtor, which is essential to the successful reorganization of the Debtor's businesses.

58. Each Lender is unwilling to extend the Second DIP Loan unless it is granted a superpriority, priming lien on all of the Debtor's property to be repaid out of the first proceeds of any sale of the Debtor or otherwise subject to the same relative priority of each Lender in the Debtor's property prior to the Petition Date. The Debtor's reorganization efforts cannot continue without the Second DIP Loan. Without the Second DIP Loan, the Debtor will immediately cease operation, thus causing employees to lose their jobs.

59.     Notwithstanding the relative priming liens pursuant to §364(d) of the Bankruptcy Code, any rights, liens and interests granted to the Lenders pursuant to §364(c)(1)-(3) of the Bankruptcy Code shall be provided to Redmont on a first-priority basis for funding the Emergency Redmont Payroll Loan and on a second-priority basis, *pari passu*, to all Lenders for funding the Continued Payroll Loan .

C.  Interim Approval Should Be Granted

60.     Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure provide that a final hearing (the "Second DIP Final Hearing") on a motion to use cash collateral pursuant to § 363 and to obtain credit pursuant to § 364 may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a Debtor's estate.

61.     Pursuant to Rule 4001(b) and 4001(c), the Debtor request that the Court conduct an expedited preliminary hearing on the Second DIP Motion (the "Second DIP Interim Hearing") and grant the relief requested in the proposed Interim Order in order to (a) maintain the Debtor's ongoing operations and (b) avoid the immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest that would otherwise ensue.

62.     The Debtor has an urgent and immediate need for cash to continue to operate.

63. The Debtor will be immediately and irreparably harmed absent authorization from the Court to use cash collateral and obtain secured credit as requested on an interim basis pending a Final Hearing on the Second DIP Motion. In the short-term, if the Debtor's locations are unable to provide customers with a continuous supply of product, competitors will capitalize on their inability to promptly fulfill the demand of their customer base, which likely will have a long-term negative impact on the value of the Debtor's businesses, to the detriment of all parties in interest. Moreover, if the Debtor's locations are closed, even on a temporary basis, there will likely be an exodus of trained employees that will make continued operations impossible.

64. So long as such funds are advanced to creditors of Debtor in accordance with the Interim Order and the DIP Credit Agreement (including the budget annexed thereto), no recipient of any funds from Debtor, whether from the use of cash collateral or from the Second DIP Loan, shall be compelled to disgorge any such funds for any reason.

## Request for Final Hearing

65. The Debtor also request that the Court schedule the final hearing during the week that is three (3) weeks after the date of this Second DIP Motion, with objections, if any, to the Final Order being due writing on or before the date that is at least five (5) business days prior to the Final Hearing.

## Disclaimer

66. Notwithstanding anything to the contrary contained herein, the parties continue to negotiate certain material terms of Second DIP Loan and the Second Interim DIP Order.

67.     Moreover, after the Financial Inspection has proceeded, the Debtor reserves the right to request an increase in the Second DIP Loan beyond the Emergency Redmont Payroll Loan and Continued Payroll Loan.

## Notice

68.     The Debtors will provide notice of this Motion to: (a) the Office of the Bankruptcy Administrator for the Northern District of Alabama; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) all secured lenders; (d) equipment and real property lessors; (e) the United States Attorney's Office for the Northern District of Alabama; (f) the United States Internal Revenue Service; (g) all relevant state taxing authorities; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully request that the Court enter an order: (i) authorizing the debtor to obtain post-petition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (ii) scheduling final hearing pursuant to Bankruptcy Rules 4001(b) and (c) and further relief as this Court may deem just and proper.

Birmingham, Alabama
Dated: December 9, 2019

 _/s/ Samuel C. Stephens_____
Lee R. Benton
Samuel C. Stephens
BENTON & CENTENO, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
Telephone: (205) 278.8000
sstephens@bcattys.com

**Exhibit A**

**Budget**